**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| BETH PEPPER, | ) | |
| | ) | |
| Plaintiff, | ) | NO: 1:23-cv-01546 |
| | ) | |
| v. | ) | |
| | ) | |
| KUNAL TAILOR and LYFT, INC., | ) | JURY DEMANDED |
| | ) | |
| Defendants. | ) | |

**RESPONSE TO MOTION TO COMPEL ARBITRATION
AND STAY PROCEEDINGS**

NOW COMES Plaintiff BETH PEPPER, by and through her attorneys, POWER ROGERS

LLP, and in response to Defendant Lyft's Motion to Compel Arbitration and Stay Proceedings,

states as follows:

## I.    INTRODUCTION

Defendant Lyft's Motion to Compel arbitration must be denied where there is a question of

fact as to whether Plaintiff Beth Pepper and Lyft had a valid contract under Illinois law to arbitrate

this claim according to the arbitration provisions contained within the "Terms of Service". The

Plaintiff does not dispute that she clicked the "I agree" button on Lyft's "Terms of Service" page,

however the Plaintiff disputes that she entered into a contract with Lyft. She did not read the terms

on the application when creating an account, was unaware that she was waiving her right to a jury

trial, and further was unaware that she was agreeing to arbitrate all disputes, with limited

exceptions. There is a question of material fact as to whether a contract was formed between

Plaintiff and Lyft and without a contract, the arbitration provisions within the "Terms of Service"

cannot be enforced. There is a question of material fact whether there was a meeting of the minds

1

or a manifestation of mutual assent between the Plaintiff and Defendant Lyft precluding the granting of Defendant Lyft's motion to compel arbitration.

## II.     STATEMENT OF FACTS

This matter arises out of a motor vehicle accident on August 17, 2022, during which Plaintiff Beth Pepper, was a passenger in a vehicle being operated by Defendant Kunal Tailor for Defendant Lyft. (Doc. 1-1). Ms. Pepper had utilized the Lyft application on her smartphone to obtain a ride to O'Hare Airport from downtown Chicago where she had been visiting for work purposes. Defendant Tailor was then connected with Ms. Pepper through Defendant Lyft's application to provide her with a ride.  While on the way to O'Hare Airport on Interstate 94, Defendant Tailor lost control of his motor vehicle, leaving the roadway, and striking an embankment. Ms. Pepper, due to her severe injuries, was transported via ambulance to Lutheran General Hospital where she subsequently underwent a cervical fusion for a fractured cervical spine.

Plaintiff subsequently filed this cause of action in the Circuit Court of Cook County and then Defendant Lyft removed it to the Northern District of Illinois based upon diversity jurisdiction. (Doc. 1). Following this removal, Defendant Lyft advised Plaintiff that it had procured a $1 million policy of insurance coverage for Defendant Tailor. (Doc. 10-3). Defendant Lyft further advised Plaintiff that they were willing to forego moving to compel arbitration in favor of remaining in Plaintiff's chosen venue if Plaintiff agreed to dismiss Lyft with prejudice. (Doc. 10-3). Lyft further offered that it would waive the right to arbitrate the dispute and that Plaintiff would have the $1 million available to compensate her for the injuries she sustained. (Doc. 10-3). Counsel for Plaintiff requested counsel for Defendant Lyft provide the available excess coverage amounts above the $1 million as Plaintiff's injuries were extensive and the $1 million would likely not be sufficient to

compensate her for her injuries. Counsel for Lyft did not provide this information and instead filed the instant Motion to Compel Arbitration.

## III.     STANDARD OF REVIEW

When deciding whether to grant a party's motion to compel arbitration, the court shall proceed summarily to a trial if the formation of an arbitration agreement is in issue. *Sgourus v. TransUnion Corp.,* 2015 WL 507584 citing 9 U.S.C. § 4. While the Federal Arbitration Act does not expressly identify the evidentiary standard a party seeking to avoid arbitration must meet, most courts apply a standard similar to that required of a party opposing summary judgment under Rule 56(e) of the Federal Rules of Civil Procedure. *Van Tassell v. United Marketing Group, LLC,* 795 F.Supp.2d 770, 787 (2011) citing *Tinder v. Pinkerton Security,* 305 F.3d 728, 735 (7th Cir. 2002); *Bensadown v. Jobe-Riat,* 316 F.3d 171, 175 (2nd Cir 2003); *Aliron Int'l, Inc. v. Cherokee Nation Indust. Inc.,* 531 F.3d 863, 865 (D.C. Cit. 2008). Accordingly, the party opposing arbitration must identify a triable issue of fact concerning the existence of the agreement in order to obtain a trial on the merits of the contract. *Id.* Just as with motions for summary judgment, in deciding whether there is a genuine issue of material fact for trial, the evidence of the party opposing compelled arbitration is to be believed and all justifiable inferences are to be drawn in its favor. *Id.*

## IV.     ARGUMENT

### a.  **Lyft's Motion Should Be Denied As There Is A Question of Fact As To Whether A Contract Was Formed.**

Defendant Lyft's motion should be denied where there is a question of material fact as to whether a contract was formed between the Plaintiff and Defendant such that the arbitration agreement is enforceable. Plaintiff did not have a meeting of the minds or mutual assent when the Plaintiff clicked on the "I Agree" button on her iPhone when creating an account with Lyft as she

3

had not read, was not required to read, was unaware she was waiving her right to a trial by jury, was unaware that she was agreeing to arbitrate all claims, and was unaware she was entering into a contract with Lyft. In arguing that this Court has no discretion and the Plaintiff is contractually bound to arbitrate her claims, Defendant Lyft has in essence put the cart before the horse. Prior to determining whether the Plaintiff's claims are subject to arbitration, this Court must first make a determination of whether the parties entered into a contract under Illinois law when the Plaintiff created an account with Lyft on their application on her iPhone. Under Illinois contract law, to have a contract the determination is whether there was a meeting of the minds or mutual assent between the Plaintiff and Defendant Lyft when Plaintiff clicked on "I Agree" on the "Terms of Service" page on the Lyft application. As set forth at length below, there is a question of material fact as to whether there was a meeting of the minds and mutual asset such that there was a contract formed between the Plaintiff and Defendant where the Plaintiff was unaware she was agreeing to arbitrate all claims, agreeing to waive her right to a jury trial, did not read the Terms of Service at the time she signed up for the application, was not required to read the Terms of Service, and never viewed the section of the Terms of Service pertaining to arbitration. (Ex. 1).

The Supreme Court has interpreted that the Federal Arbitration Act (FAA), while reflecting a liberal federal policy favoring arbitration, embodies a fundamental principle that arbitration is a matter of contract. *AT&T Mobility LLC,* 131 S.Ct. 1740, 1745 (2011). Courts, not arbitrators, are presumed to be the decision makers for resolving questions of contract formation and arbitrability. *Sgouros v. TransUnion Corp.,* 2015 WL 507584 citing *Granite Rock Co. v. Int'l Broth. Of Teamsters,* 130 S.Ct. 2847, 2856 (2010). In order to rule on a motion to compel arbitration based on the FAA, 9. U.S.C. § 2, the Court must first determine whether there are grounds at law or in equity for revocation of contract, including the question of whether the parties have agreed to

4

arbitrate the dispute in question. *Granite Rock Co.,* 130 S. Ct. at 2855. The Supreme Court has been clear, arbitration is strictly a matter of consent, and thus is a way to resolve those disputes, *but only those disputes,* that the parties have agreed to submit to arbitration. *Id* at 2857. As such, courts should only compel arbitration when (1) a valid arbitration agreement exists between the parties and (2) absent a valid provision designating arbitration to resolve such disputes, the enforceability or applicability of arbitration to the dispute is not at issue. *Id* at 2858.

Before addressing the scope of an arbitration agreement, the Court must first address the threshold inquiry of whether a contract exists between the parties to arbitrate. *Van Tassell,* 795 F.Supp.2d at 788 citing *Janiga v. Questar Capital Corp.,* 615 F.3d 735, 742 (7th Cir. 2010). Contract formation is governed by state law. *Id.* In Illinois, arbitration agreements are analyzed using ordinary principles of contract law. *Id* citing *Carey v. Richards Bldg. Supply Co.,* 367 Ill.App.3d 724 (2006). This analysis begins with addressing whether "the basic ingredients" of a contract – offer, acceptance, and consideration – are present. *Id.* Furthermore, the making of contracts over the internet "has not fundamentally changed the principles of contract." *Id* at 789 citing *Register.com v. Verio, Inc.,* 356 F.3d 393, 403 (2d Cir. 2004). Thus, the basic tenet of contract law remains unchanged: in order to be binding, a contract requires a "meeting of the minds" and a manifestation of "mutual assent." *Id.* The requirement of manifestation of assent applies with equal force to arbitration agreements; thus, clarity and conspicuousness of arbitration terms are important in securing informed assent. *Id* at 790 citing *Specht v. Netscape Commc'ns Corp.,* 306 F.3d 17, 30 (2.d Cir. 2002).

In analyzing web-based agreements, courts have discussed the different between "clickwrap" and "browsewrap" agreements, terms describing the manner in which a user manifests assent. *Ambrosius v. Chicago Athletic Clubs, LLC,* 2021 IL App (1st) 200893, ¶ 29. A clickwrap agreement

requires a website used to expressly assent to the website's terms of use by clicking on an "I agree" box after being presented with terms, before continuing with an Internet transaction. *Id.* A "clickwrap" agreement is formed when website users click a button that indicates that users "agree or accept" to terms of an agreement upon viewing its terms posted on the website. *Nguyen v. Barnes & Noble,* 763 F.2d 1171, 1175-76 (9th Cir. 2014). To determine whether there was a valid clickwrap agreement, the court must determine whether users (i) had reasonable notice of the terms of a clickwrap agreement and (ii) manifested assent to the agreement. *Specht v. Netscape Communications Corp.,* 306 F.3d 28-30 (2nd Cir. 2002). In the case at bar, the question is whether the agreement in Defendant Lyft's application which set forth the "Terms of Service" containing the provisions regarding arbitration was a valid clickwrap agreement and whether Plaintiff Beth Pepper's clicking the 'I agree" button constituted assent to this agreement.

Plaintiff Beth Pepper is not disputing that she clicked on the "I agree" button on the "Terms of Service" page on the Lyft application when creating her account. However, she disputes that she had notice of the terms of this agreement and that her clicking on this "I agree" manifested assent to the agreement. (Ex. 1, Affidavit of Beth Pepper). While there was a window on the "Terms of Service" page, the entirety of the terms, including section 17 pertaining to the arbitration provision, were not visible on the main page. (Ex. 2, Terms of Service view). Defendants attach the "Terms of Service" to their motion as an exhibit, but wholly fail to acknowledge this is not how it appeared on the Plaintiff's smart phone and certainly would not be in the same large font. Plaintiff at the time had an Apple iPhone 11 with a screen size of 6.1 inches diagonally. (Ex. 1, Affidavit of Beth Pepper). The font on her screen was far smaller than the font in Defendant's exhibit which purports to be the "Terms of Service". (Ex. 1, Affidavit of Beth Pepper). Furthermore, the Lyft Terms of Service that Defendant Lyft attaches as an exhibit is 38 pages of

6

large typed font on standard 8 x 11" paper. (Doc. 10-2). There is no question that the number of screens that Plaintiff Beth Pepper would have to scroll through to read the entirety of the terms is far more than 38 pages on her iPhone in font that was mere centimeters in order to be able to review the entirety of the "Terms of Service" agreement. (Ex. 1, Affidavit of Beth Pepper, Ex. 2, Terms of Service view). It is without question that the entirety of the "Terms of Service" was not apparent on its face on this main page and to get any information about arbitration and what rights she was apparently waiving, Plaintiff Pepper would have had to scroll through numerous pages on her iPhone, none of which she was required to do in order to create her account. (Ex. 1, Affidavit of Beth Pepper; Ex. 2, Terms of Service view). While Defendant Lyft relies upon the fact that Plaintiff Beth Pepper created an account to support their argument that she read the terms of service, there is no question that Plaintiff did not scroll through the numerous screens to review the "Terms of Service" prior to creating her account. (Ex. 1, Affidavit of Beth Pepper). Furthermore, it would be unreasonable to think that the average non-lawyer user, such as Plaintiff Beth Pepper, would understand the numerous pages of the terms of service or scroll through pages upon pages of incredibly small font "Terms of Service" when creating an account with Lyft if not required to review the agreement prior to proceeding with creating the account. A court cannot presume that a person who clicks on a box that appears on a screen has notice of all contents not only of that page but of other content that requires further action (scrolling, following a link, etc.). *Applebaum v. Lyft, Inc.,* 263 F.Supp.3d 454, 466 (2017) citing *Sgourus,* 817 F.3d at 1035. The issue is whether the mobile application screen adequately communicated all of the terms and conditions of the purported agreement and whether the purchased received reasonable notice of these terms. *Id.* Simply put, Plaintiff Beth Pepper was unaware of the "Terms of Service", including section 17 pertaining to arbitration, at the time she created an account with Lyft.

Furthermore, while Defendant Lyft claims that the Plaintiff was directed to scroll through and read the entire text of the "Terms of Service" agreement prior to accepting them, there was no requirement for Plaintiff to do so. (Ex. 1, Affidavit of Beth Pepper). Simply because Plaintiff created an account with Lyft does not reveal whether Plaintiff in fact read and understood the "Terms of Service" such that there would be a meeting of the minds. Defendant Lyft's reliance on the actual profile of the Plaintiff is not instructive as to whether there was a meeting of the minds and mutual assent such that an enforceable contract was formed between Plaintiff and Lyft. It is uncontroverted that for Plaintiff to get to the portion of the "Terms of Service" pertaining to section 17 which set forth the arbitration provisions, she would have had to either scroll through many pages of the "Terms of Service" or clicked on a hyperlink. (Ex. 1, Affidavit of Beth Pepper). While Plaintiff Pepper was required to click on "I agree" to advance forward in the process of creating her profile with Lyft, she was not required to scroll through and read the terms of service, she was not required to review section 17, she was not required to click on any hyperlink for section 17, and never reviewed any of the language of the agreement prior to clicking "I agree." (Ex. 1, Affidavit of Beth Pepper). When creating an account on the Lyft application, the person creating the account is not required to scroll through the entire "Terms of Service". Certain websites require users to scroll through an entire agreement prior to being able to even click on an "I agree" button. The Lyft application did not require this and Plaintiff Pepper was able to merely click on the "I agree" without having to review any of the "Terms of Service." (Ex. 1, Affidavit of Beth Pepper). Without having scrolled past the first page, clicked on the section 17 link, or reviewed the entire "Terms of Service", Plaintiff Pepper was unaware that she was agreeing to arbitrate any dispute with Lyft involving personal injuries. (Ex. 1, Affidavit of Beth Pepper). She further was unaware that she was waiving her right to a jury trial or pursue a cause of action in this

Court. (Ex. 1, Affidavit of Beth Pepper). Further, to date, Plaintiff has not read the "Terms of Service on the website and was wholly unaware that she was waiving her right to a jury trial and agreeing to binding arbitration at the time she procured the Lyft ride on the date of her accident. (Ex. 1, Affidavit of Beth Pepper). There was no "meeting of the minds" as to the "Terms of Service" on the Lyft application as Plaintiff Pepper was unaware what the essential terms and conditions of the contract, namely the "Terms of Service" were at the time she clicked "I agree" and created her account. Further, to date, Plaintiff Beth Pepper has not read the entirety of the "Terms of Service" on either the Lyft application or Lyft's website. There is no reason to believe that "Terms of Service" is self-defining for reasonable consumers as equivalent to "Binding Contract" or "Final Contract". *Applebaum,* 263 F.Supp.3d at 468. Courts have previously found that similar phrases such as "terms of use" or "terms and conditions" do not clearly inform a user that she is subjecting herself to a one-sided contract that purports to modify her basic legal rights and remedies. *Id.* A court cannot simply assume that the reasonable (non-lawyer) smartphone user is aware of the likely contents of "Terms of Service" and said user may be forgiven for assuming that it refers to a description of the types of services that the company intends to provide. *Id.* The notice of the proposed contract terms in this case, buried within numerous pages of a "Terms of Services" entitled scrollable webpage is insufficient to bind the plaintiff to the terms of that agreement and create a valid contract under Illinois law. *Id.* A meeting of the minds between parties occurs when there has been assent to the same things in the same sense on all essential terms and conditions. *Quinlan v. Stouffe,* 355 Ill.App.3d 830, 839 (2005). At a minimum, there is a question of fact as to whether there was a meeting of the minds sufficient to create a valid and enforceable contract between the parties. Under Illinois law, a contract cannot be validly formed

9

without a meeting of the minds and mutual assent. This question of fact precludes the granting of Defendant Lyft's motion to compel arbitration.

As set forth above, prior to making a determination of whether the arbitration provisions in the "Terms of Service" are enforceable and applicable to the case at hand, this Court must first decide, under Illinois law, whether there was an enforceable contract. Plaintiff Beth Pepper, being unaware of the terms set forth, being aware of her rights she was waiving, and not being required to read or actually reading the numerous pages of the "Terms of Service" did not have a meeting of the minds and mutual assent such that a contract could be formed under Illinois law. At a minimum, there is a question of fact as to this issue which precludes the granting of Defendant Lyft's motion to compel arbitration and stay the proceedings. Without a valid contract between the parties, this Court need not decide whether the scope of the arbitration agreement applies to the case at hand as Defendant Lyft cannot compel arbitration in a purported contract that was not a validly formed contract under Illinois law. Based upon the foregoing, Defendant Lyft's motion to compel arbitration should be denied.

### b. The Cases Cited By Defendant Lyft Are Distinguishable From The Case At Hand And Not Instructive.

Defendant Lyft cites to numerous cases in support of its arguments throughout its brief, however the cases are distinguishable from the case at bar and are not instructive as set forth below.

Defendant Lyft cites to *Osvatics v. Lyft, Inc.*, 535 F.Supp.3d 1 (D.D.C. 2021), in support of its claims that it is well-established that Lyft's method of obtaining assent to its terms of Service is bringing and sufficient, however that case is distinguishable from the case at hand. In *Osvatics,* the plaintiff, a ride-share driver for Lyft, brought a putative class-action alleging that Lyft was violating District of Columbia laws by failing to provide paid sick leave to its drivers. *Id* at 4. The

citation that Defendant Lyft refers to in its brief actually is specific to Lyft drivers. *Id* at 10-11. The analysis of whether there was a binding contract is easily distinguishable from the case at hand concerning a passenger of Lyft, not a driver. Specifically, when determining that there was a valid contract between the parties, the Court in *Osvatics* noted that the driver did not opt out of the arbitration provision, the driver consented to the contract, and the driver received consideration for it, specifically receiving access to the Lyft platform for procuring rides. *Id* at 11. This is wholly inapplicable to the case at bar where the issue before this court in determining whether the arbitration provision applies to this case is whether the Plaintiff, a Lyft passenger and not driver, and Lyft had a meeting of the minds or mutual assent such that the "Terms of Service" were a binding contract. As such, the *Osvatics* case is not instructive.

Similarly, the *Kinsbury* case relied upon by Defendant Lyft involved various plaintiffs who were Lyft drivers and part of the Lyft Ambassador program who filed a cause of action against Lyft for various violations of Illinois law. The plaintiffs did not dispute that they entered into an agreement and agreed to the User Terms or the Ambassador Terms. *Kingsbury v. Lyft, Inc.*, 2018 WL 905509. Similarly, in the *Dileo* case cited by Defendant Lyft again is not instructive as in that case the parties agreed that there was a valid contract that contained a valid arbitration agreement and the issue for the court to decide was whether contribution claims fell within the arbitration agreement clauses. *Dileo v. Vi-Jon Laboratories, Inc.*, 2007 WL 1118444. As such, these are clearly distinguishable from the case a bar where the Plaintiff was a passenger in a Lyft and there is a dispute regarding whether she entered into an agreement when clicking "I Agree" on the "Terms of Service.

Defendant Lyft relies upon *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79 (2002), *Emps. Ins. Co. of Wausau v. Century Indem. Co.*, 443 F.3d 573 (7th Cir. 2006), for their argument that a

11

court may decide whether the parties are bound by a given arbitration clause and whether that clause applies to a particular type of controversy. Similarly, in *Simula Inc. v. Autoliv, Inc.,* 175 F.3d 716 (1999) the court was deciding how broad certain language in an arbitration clause should be construed. In *Moses H. Cone Memorial Hosp. v. Mecury Construction Corp.,* 460 U.S. 1 (1983), again the Court was deciding whether the district court erred in staying an action and request to compel arbitration pending the outcome of a concurrent state court action. However, again these cases are inapplicable as in these cases the parties did not dispute that there was a valid contract between the parties, but instead disagreed about whether the issue in the case fell within the arbitration agreements such that it should be decided by an arbitrator and not the court. Clearly these cases are distinguishable from the case at bar where the issue before the Court is whether there was a valid contract such that it is enforceable, not whether the parties are bound by certain provisions in the arbitration clause.

In support of its argument that the scope of the arbitration agreement is for the arbitrator, not this Court, Defendant Lyft cites to numerous cases. However, what is distinguishable of all of these cases from the case at bar, there is no dispute in these cases about whether there is a contract to arbitrate. As set forth at length above, there is a question of fact whether there was a valid contract under Illinois law between the Plaintiff and Lyft in this case such that the parties must arbitrate. In *Rent-A-Center, West, Inc. v. Jackson,* 130 S.Ct. 2772 (2010), the plaintiff brought a §1981 action alleging race discrimination and retaliation by his former employer which the employer moved to dismiss and compel arbitration. In that case, there was no dispute that the parties had formed a contract, it was just whether it was unconscionable. *Id.* This is distinguishable from the case at hand where the issue is whether there was a meeting of the minds and the parties assented to the agreement such that a valid contract was formed. As such, this case is not

12

instructive. In further support of this argument, the Defendant cites to the *Schein v. Archer & White Sales, Inc.*, 139 S.Ct. 524 (2019), the Court was deciding whether the arbitrability of a particular dispute was for the arbitrator to decide and there was no issue between the parties as to whether there was a valid contract to arbitrate. In *McClenon v. Postmates, Inc.*, 473 F.Supp.3d 803 (N.D. Ill. 2020) cited by the Defendant, the parties agreed that the Mandatory Arbitration Provision was valid and that the Petitioner's claims must be resolved through arbitration. The issue in that case was whether the Petitioners needed to file individual arbitration demands or could proceed to arbitration as essentially a class. *Id* at 808. Similarly in the *Hudgins v. Total Quality Logistics, LLC,* the parties did not dispute the arbitration agreements, but instead their enforceability. *Hudgins v. Total Quality Logistics, LLC,* 2016 WL 7426135. This is clearly not instructive to the case at bar where the Plaintiff disputes that her claims must be resolved through arbitration.

In *Lee v. Uber Technologies, Inc.*, 208 F.Supp.3d 886 (2016), the cause of action was brought by Uber drivers in Illinois for various claims under Illinois state law. In that case, unlike the case at bar, the Plaintiffs did not dispute that they accepted the terms of the agreement with Uber, but instead argued that it was procedurally and substantively unconscionable. *Id* at 891. Unlike the case at bar where the issue is whether there was a valid contract formed under Illinois law, the issue for the Court in *Lee* was whether the Court could decide the validity of the Arbitration clause or whether the parties agreed to delegate this, and other gateway issues, to the arbitrator. This case is easily distinguishable and not instructive.

## V.      CONCLUSION

For the reasons stated herein, Plaintiff BETH PEPPER, respectfully requests this Honorable Court deny Defendant Lyft's Motion to Compel Arbitration and Stay Proceedings as there is a question of fact whether the parties created an enforceable contract under Illinois state law.


Respectfully submitted,

    _/s/ Carolyn S. Daley_____
Attorney for Plaintiff

Carolyn S. Daley
POWER ROGERS LLP
70 W. Madison, 55th Floor
Chicago, IL 60602
312-236-9381 – phone
312-236-0920 – fax
cdaley@powerrogers.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

BETH PEPPER,                )
                                  )
     Plaintiff,            )     NO: 1:23-cv-01546
                                  )
        v.              )
                                  )
KUNAL TAILOR and LYFT, INC.,   )     JURY DEMANDED
                                  )
     Defendants.         )

I, Beth Pepper, being first duly sworn on oath, declares the following:

1.  I am Beth Pepper, the Plaintiff in this cause of action.

2.  I am over the age of eighteen and of sound mind and body.

3.  I downloaded the Lyft application on my Apple smartphone in 2021.

4.  I created an account with Lyft on my Apple smartphone in 2021.

5.  The Apple smartphone that I had in 2021 was the iPhone 11.

6.  The screen on my Apple smartphone measured 6.1 inches diagonally.

7.  I have utilized the Lyft application to obtain rides.

8.  When I created an account with Lyft, I was required to input certain personal information in the Lyft application.

9.  When I created an account with Lyft, I did not scroll through the "Terms of Service".

10. When I created an account with Lyft, I did not read the "Terms of Service".

11. When I created an account with Lyft, the font on the "Terms of Service" on my phone was only several centimeters in size.



12. When I created an account with Lyft, it did not require me to read the "Terms of Service".

13. When I created an account with Lyft, it did not require me to scroll through the "Terms of Service" to click the "I agree" tab.

14. When I created an account with Lyft, I did not even go to section 17 of the "Terms of Service" to learn how claims between myself and Lyft could be brought.

15. When I created an account with Lyft, I was not required to go to section 17 of the "Terms of Service" to learn how claims between myself and Lyft could be brought.

16. When I created an account with Lyft, I was not required to click on the hyperlink that said "See Section 17 Below".

17. When I created an account with Lyft, I was not required to click any hyperlink that said "See Section 17 Below" to click the "I agree" tab.

18. When I created an account with Lyft, I did click on any hyperlink that took me to Section 17 of the "Terms of Service".

19. When I created the account with Lyft, I did not scroll past the print that was on the first page of the "Terms of Service".

20. When I created the account with Lyft, the entire "Terms of Service" text was not visible at once on my Apple smartphone screen.

21. When I created the account with Lyft, the arbitration provision of the "Terms of Service" text was not visible on my Apple smartphone screen.

22. When I created the account with Lyft, only portions of the "Terms of Service" were visible on my Apple smartphone screen.

23. When I created the account with Lyft, I was not required to scroll past this first screen on my Apple smartphone to click on "I accept".

24. When I created an account with Lyft, I did not know that I was agreeing to arbitrate any dispute involving personal injuries.

25. When I created an account with Lyft, I did not know that I was waiving my right to pursue a cause of action against Lyft in Court for personal injuries.

26. When I created an account with Lyft, I did not know that I was waiving my right to a jury trial if there was a dispute involving personal injuries.

27. To move past the page with the "Terms of Service" and create my account with Lyft, I was not required to scroll through the "Terms of Service".

28. To date, I have never read the "Terms of Service" for the Lyft application.

29. Prior to August 17, 2022, when I was a passenger in a Lyft vehicle that was involved in a motor vehicle accident, I had not read the "Terms of Service" on the Lyft application.

30. Prior to August 17, 2022, when I was a passenger in a Lyft vehicle that was involved in a motor vehicle accident, I had not read the "Terms of Service" on Lyft's website.

31. When I created an account with Lyft, the font on the screen of my Apple smartphone was much smaller than the font in Exhibit 2 of Defendant Lyft's Motion to Compel Arbitration.

32. When I created an account with Lyft, the "Terms of Service" were not presented to me in the manner they are in Exhibit 2 of Defendant Lyft's Motion to Compel Arbitration.

33. Prior to the filing of Defendant Lyft's Motion to Compel Arbitration, I had never seen a 38 page document from Lyft entitled "Lyft Terms of Service" which is Exhibit 2 of Defendant Lyft's Motion to Compel Arbitration.

Under penalties of perjury, I declare that I have read the foregoing declaration and that the facts

contained herein are true and correct to the best of my knowledge.

*Beth Pepper*

Beth Pepper

Subscribed to me and sworn to before
me on this 12th day of July 2023.

Notary Public

OFFICIAL SEAL
KRYSTIN L CASE OBERMEIER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES: 08/09/2026

4

## Lyft Terms of Service

Last Updated: December 9, 2020

These Terms of Service constitute a legally binding agreement (the "Agreement") between you and Lyft, Inc., its parents, subsidiaries, representatives, affiliates, officers and directors (collectively, "Lyft," "we," "us," or "our") governing your use of the Lyft application (the "Lyft App"), website, and technology platform (collectively, the "Lyft Platform").

PLEASE BE ADVISED: THIS AGREEMENT CONTAINS PROVISIONS THAT GOVERN HOW CLAIMS BETWEEN YOU AND LYFT CAN BE BROUGHT (SEE SECTION 17 BELOW). THESE PROVISIONS WILL, WITH LIMITED EXCEPTION, REQUIRE YOU TO SUBMIT CLAIMS YOU HAVE AGAINST LYFT TO BINDING AND FINAL ARBITRATION ON AN INDIVIDUAL BASIS, NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY CLASS, GROUP OR REPRESENTATIVE ACTION OR PROCEEDING. AS A DRIVER OR DRIVER APPLICANT, YOU HAVE AN OPPORTUNITY TO OPT OUT OF ARBITRATION WITH RESPECT TO CERTAIN CLAIMS AS PROVIDED IN SECTION 17.

By entering into this Agreement, and/or by using or accessing the Lyft Platform you expressly acknowledge that you understand this Agreement (including the dispute resolution and arbitration provisions in Section 17) and accept all of its terms. IF YOU DO NOT AGREE TO BE BOUND BY THE TERMS AND CONDITIONS OF THIS AGREEMENT, YOU MAY NOT USE OR ACCESS THE LYFT PLATFORM OR ANY OF THE SERVICES PROVIDED THROUGH THE LYFT PLATFORM. If you use the Lyft Platform in another country, you agree to be subject to Lyft's terms of service for that country.

**I Agree**

EXHIBIT
2
PENGAD 800-631-6989

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned, an attorney, certifies that she caused the foregoing Response to Motion to Compel Arbitration And Stay Proceedings to be filed with the Clerk of the U.S. District Court for the Northern District of Illinois using the CM/ECF System which will send notification of such filing to the attorneys of record on this 14th day of July, 2023.

By: _/s/ Carolyn S Daley_